IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| MONIKA TAYLOR, individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) Case No. 3:16-cv-00661-MO ) |
| v. | ) ) |
| NIKE, INC. | ) August 18, 2017 ) |
| Defendant. | ) Portland, Oregon ) |

Oral Argument

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL W. MOSMAN

UNITED STATES DISTRICT COURT CHIEF JUDGE

APPEARANCES


FOR THE PLAINTIFF:        Mr. Jeffrey D. Kaliel
                          Tycko & Zavareei, LLP
                          1828 L St. NW, Suite 1000
                          Washington, D.C. 20036


                          Mr. Paul Bierly
                          Markowitz Herbold, PC
                          1211 S.W. Fifth Avenue, Suite 3000
                          Portland, OR 97204



FOR THE DEFENDANT:        Ms. Michelle C. Doolin
                          Cooley LLP
                          4401 Eastgate Mall
                          San Diego, CA 92121


                          Mr. Brad S. Daniels
                          Stoel Rives LLP
                          760 S.W. Ninth Avenue, Suite 3000
                          Portland, OR 97205




COURT REPORTER:           Bonita J. Shumway, CSR, RMR, CRR
                          United States District Courthouse
                          1000 S.W. Third Ave., Room 301
                          Portland, OR  97204
                          (503) 326-8188

(P R O C E E D I N G S)

THE CLERK:  Your Honor, this is the time set for oral argument in Case No. 3:16-cv-661-MO, Taylor v. Nike.

Counsel, can you please identify yourself for the record.

MR. BIERLY:  This is Paul Bierly with Markowitz Herbold, local counsel for plaintiffs.

MR. KALIEL:  Jeffrey Kaliel, from Tycko & Zavareei in Washington, D.C. for Plaintiff Taylor.

MS. DOOLIN:  Michelle Doolin for Defendant Nike, with the law firm of Cooley.

MR. DANIELS:  Brad Daniels from Stoel Rives, also on behalf of Nike.

THE COURT:  Give me just a moment.

(There is a pause in the proceedings.)

THE COURT:  Let me give you my tentative thoughts, and then I'll hear oral argument.

I've passed out a schematic or a diagram, I guess, and it represents my attempt to understand the complaint better.  I am disappointed to some degree that at the level -- at the stage we're at discussing an amended complaint.  The complaint suffers from some of the very same flaws that we discussed last time, with no change, one of the principle ones being that it appears that there are multiple theories of fraud, but that's not easy to discern from the complaint, and

it should be easy to discern. Both the concepts or theories of fraud and the information that may be there to support them are mixed together, and so this is just my attempt to impose some order on the complaint and see what might be there.

So first of all, there are a couple issues I think are -- can be resolved in a relatively straightforward fashion without much oral argument. There's been a renewed request by Nike to dismiss the plaintiff's individual FAL and UCL and CLRA claims for lack of standing, and I deny that for the reasons that we discussed the last time we were together, I think unaltered by Nike's renewed submissions.

Nike also -- or excuse me, plaintiff also moves for injunctive relief, and for the same reasons we discussed last time, I grant Nike's request to dismiss the claim for injunctive relief.

Specifically, Nike has sought dismissal of class claims for lack of standing, because it appears that the class will include or will involve products not purchased by this plaintiff but by as yet unnamed, unknown members of the class. And that, of course, is a close question. There's no real controlling authority on that question.

In the end, it's my decision to allow those claims to go forward -- that is, to potentially allow -- not today, of course, but to potentially allow the certification of a class that includes people who bought products that plaintiff didn't

buy, and I think there's enough there to satisfy standing. It's a sort of a standing/commonality question, that although the products may differ, the fundamental legal theories don't. The evidence will be largely the same, other than on the technicalities of product pricing, but not on the theories of product pricing. In any event, I believe that the better course there is to allow those claims to go forward.

So we're really here on the core 12(b)(6) motion to dismiss the California consumer class protection claims. That's what I want to talk about today.

So that turns to our three blocks on the sheet I've given you. I see in the complaint -- and maybe in my reading of the complaint I've either added something that isn't there or missed something that is, so part of oral argument is you'll tell me that.

I see three potential theories for fraud. One is what we have previously -- I've tried to put the most commonly used nickname to these theories here.

One might be called the false-price theory, and that also can be thought of as the outlet-exclusive theory. The theory of fraud there is that there is dual pricing on products that were never sold in a retail store, they were designed and manufactured to be sold in an outlet store, and the inference from all of that -- it's not the only inference, but a plausible inference from that is that they only had the outlet

store price on them ever in their existence, and that any other price is imaginary.  That's the simplest theory, and it's, I think, fair to say the dominant theory of the complaint.

So then there are others that sort of raise their heads, and I guess I see them as two different -- in two different ways.  One is that the products aren't currently for sale at the suggested retail price in any outlet store.  If they are -- if they are for sale in any retail store, it's not for the suggested retail price.  It's not for a higher price.

And I guess that theory can also be agnostic about the past.  It asserts that they're not currently for sale at the suggested retail price in any retail store and may or may never have been for sale as such.

And then Theory 3 is a sort of a variation on Theory 2, and that is, well, if they were ever for sale at a retail store at the suggested retail price, it was more than 90 days ago.

So those are, I think, the three theories that are in the complaint.  I'll talk about their factual support in a moment, but one of the problems I have with these theories is that they are mutually -- to some degree mutually inconsistent, even at the level of abstraction.

Now it's certainly possible in complaints to plead in the alternative, but "in the alternative" typically means one of two things.  It either means there's a set of facts that can

support two different theories, and so you plead, you know, one as fraud and one as per se, you know, liability or something like that, you know.  There's two theories with the same operative facts.

And the other is that there are -- there's a set of facts that establish one claim but can be read differently, in sort of a different light, to establish a different claim.  And so that's -- those are the most common ways that claims are pled in the alternative.

It's not impossible, but it's a tricky job in a complaint to say here are the set of facts I allege that I think establish claim 1.  There's a completely different set of facts that are inconsistent with the first set of facts that if that's true would establish claim 2.  999 times out of a thousand, when a plaintiff is doing that, it simply means the plaintiff has no idea what the facts are, so then you just make up possibilities.

So, you know, here it's true, maybe they were made for outlet stores only and sold only at an outlet store price, and therefore the two-price theory is fraudulent for that reason, or maybe they weren't.  Maybe they were sold in retail stores not made for outlet stores, for sale in retail stores.  Maybe one of those is true, but both of them aren't.  At the level of theory, they're mutually inconsistent.

So I have a problem with both 2 and 3 being

fundamentally inconsistent with 1.

Perhaps more fundamentally, however, is for Rule 9 and Rule 12(b) purposes is only one of them has any real factual support.  There is no real factual support in the amended complaint for Theory 2 or Theory 3.  There's nobody that says they saw one of these in a retail store.  There's nothing to say that, you know, they even saw an ad for one in a retail store or had their neighbor's cousin tell them they bought one at a retail store; nothing.  You have articles that suggest that this may be a merchandising pattern for some products for retailers, and as I made clear at our last go-around, I'm not going to let a complaint for fraud rest on what you read in an article, which will end up being utterly inadmissible at trial anyway.

So that's the difference.  Again, I'm just giving you my tentative views.  I'll hear from you.  That's the difference between 2 and 3 on the one hand, and then on 1.  At least as to 1 you have some employees saying, "Yeah, that's what we do.  We make these products for outlet stores."

So that gets you, okay, they were never for sale in a retail, they were made for outlet stores.  It gives you -- it's a thin reed, but it gives you the rational inference that if they were made for outlet stores, then they probably only ever had one price, I guess the reasonable inference being that they're not on sale at the outlet store from a former outlet

store higher price, and in any event, that that's not what suggested price means.  I think I could get you that far on Theory 1.

So those are my two -- my real questions about 2 and 3 versus 1, the theoretical incompatibility of 1 compared to 2 and 3, and the factual underpinnings being lacking for 2 and 3 but not 1.

So I'll hear from Nike on letting 1 go forward in a minute, but let's start with plaintiffs on the problems I see with 2 and 3.

MR. KALIEL:  Thank you, Your Honor.  Thank you for the chance to be before you again today.

I apologize for not making it clear enough in the complaint, but I think there is an easy enough explanation for what we need to do by way of Theory 1 and Theory 3.

THE COURT:  Let me ask first -- as I said, this is my attempt to discern what you're trying to do in the complaint. Have I either added a theory you are not advancing or missed one you are?

MR. KALIEL:  Your Honor, I don't think we're advancing 2.  I think we are advancing 1 and 3.

THE COURT:  All right.

MR. KALIEL:  And I think we're advancing 1 and 3 with respect to different products; that is, Theory 1 applies to one set of products at the outlet.  That is those manufactured

exclusively for the outlet.  For example, we have an article that says T-shirts are manufactured exclusively for the outlet, never sold anywhere else.

With respect to a second basket of products, we're talking about Theory 3, which is that they were at some point sold at mainline stores, whether at Nike's mainline stores or other retailers for something approaching the full price, but that was a long time ago and not within the 90 days, for example, required by the fair advertising law.  So when you go into a Nike Outlet store, you may be seeing one of those two types of products when you pick up a pair of socks, a pair of shoes, or a T-shirt.

THE COURT:  Plaintiff doesn't know which is which as to what she bought, right?

MR. KALIEL:  Except that she believes to the best of her ability that based on the news articles, the T-shirt she bought at the very least were manufactured for outlet, and she doesn't have enough information to know whether the other products she bought were one of the -- were either manufactured for outlet or were what we call remakes.

THE COURT:  And so as to factual support for the idea that they were only offered at a higher price more than 90 days ago, you have just the articles, right?

MR. KALIEL:  You hit it on the head, Your Honor. That's all we've got.  That's all we've got.

But I do think, when understood as applying to different products, they should not be mutually exclusive, Theory 1 and Theory 3.  And part of the job of discovery will be to determine hopefully which theory applies to which products, how prevalent each practice was within the outlet, but we think both of the practices are happening.  We just don't know how much.

THE COURT:  Well, I agree with you that, of course, if you're talking about different products and you're making the claim that only some products are made uniquely for outlet stores, not all, that both of those are satisfied, that you've avoided the theoretical incompatibility of 1 and 3.

MR. KALIEL:  That is correct.

THE COURT:  We're really left with have you really shown that you have in your plaintiff both kinds of products.  Have you shown that outlet stores -- you've made the assertion before that the outlet stores -- excuse me, thinking of it in the reverse, that Nike makes products for outlet stores, that's what you'd find in outlet stores.

So have you shown that that's really just a mixed bag, some yes, some no, and then have you shown that for your plaintiff, as to Theory 3, she bought one that was formerly priced higher more than 90 days ago?

MR. KALIEL:  I would say --

THE COURT:  Can you tell me, even though I have to

eventually look to articles to learn that this happened, does the complaint even tell me like a product for which the complaint says this is true?  That is, that it was sold at a higher price more than 90 days ago.

MR. KALIEL:  It does not, Your Honor, and it does not because we don't believe we can determine that based on our publicly available information.  We believe, as in the *Rubenstein* case in the Ninth Circuit, this is information uniquely in the hands of Nike.  We need discovery to know this for a fact.

THE COURT:  We talked about that problem the last time around and even discussed some relatively simple things that could be done at least to take a stab at it.  Were any of those done?

MR. KALIEL:  Your Honor, we investigated whether it would be feasible, I can tell you that much.  I can tell Your Honor that we, plaintiff's attorneys, drafting complaints get into trouble when we, to use your words, take a stab at things. It was not going to be any more than a rough guess, a speculation if I were to attempt to do the type of investigation the Court suggested at the last time.

For example, the purchases at issue in our complaint were made in June of '15.  We filed our complaint about a year later.  The -- when I go into a Nike Outlet store, the stock is very different a year later than it was at the time she made

the original purchase.  The chances of me finding the exact shirt or the exact shirt with pricing information that is in any way relevant to what happened a year ago is remote.  And to the extent I'm trying to one year later draw inferences from what I find, it would be something I wouldn't be comfortable telling the Court or putting in a complaint.

Our complaint talks about what we believe to be the policy.

THE COURT:  Well, that's persuasive, except that right now, instead of however shaky that information is, you've given me less than that.  You're not uncomfortable having me rely on an article.  I guess your theory is that I should move forward and let you have discovery where you can be on more solid ground, because right now you're telling me that what you could have done would have been very shaky, but whatever -- however shaky it is, it would have been more than what you have given me today.

MR. KALIEL:  I'm not sure it would have been, Your Honor.  We've provided our best explanation of what the policies of the store are.  We believe we've provided a plausible way based both on news articles, based on what the employees told us.  That --

THE COURT:  What did the employees tell you about a dual system of product placement in outlet stores, some unique outlet stores, some formerly elsewhere?  What did the employees

say about the dual system?

MR. KALIEL:  We did not -- we do not have any information from the store employees about the dual system.

THE COURT:  What did they say?

MR. KALIEL:  The question was about were products manufactured exclusively for the outlets, and we were told on two occasions, twice.  We've alleged that in the complaint.

THE COURT:  They said yes, they are?

MR. KALIEL:  Yes.

THE COURT:  And your contention today, from what I remember of what they actually said, is nothing in their statement indicates all items were, just that items are made uniquely for outlet stores?

MR. KALIEL:  I think that's fair to say, yes, Your Honor.

THE COURT:  All right.  Well, not to put too fine a point on it, that is your position, then, that reliance on a theory that is at least plausibly supported by an article about how outlet stores operate for a variety of retailers, including Nike, your client may have purchased a product formerly sold elsewhere for a higher price but more than 90 days before purchase, and the only way you can advance the ball beyond that is through discovery that's entirely in the control of Nike?

MR. KALIEL:  I think that's a fair enough summary of our position.  We believe we've put forth a plausible basis to

proceed to discovery where we will learn further information to support our findings.  We think that's exactly the situation that the Ninth Circuit reviewed in the *Rubenstein v. Neiman Marcus* case.  The information is not something we can know without access to Nike's records.  We can get that easily and quickly and be back before Your Honor on a summary judgment motion it's fair to say we hope, but we need not do more, our position is, than what we've already done.  And we think we've done more in many respects than a lot of the cases, including in *Rubenstein*, that have been allowed to proceed within this circuit.

THE COURT:  All right.  Thank you very much.

Let's stick to 3 now.  I'll come back to 1 in a minute.  So why doesn't *Rubenstein* counsel me to at least let this go forward?

MS. DOOLIN:  So *Rubenstein* has absolutely no applicability to what's going on in this case because in *Rubenstein* they had a consistent theory.  The theory in *Rubenstein* at the lower levels, when the case was dismissed, was all this former manufactured -- there was all these theories, and it was dismissed.

What was appealed up by that time, and the complaint that was at issue that was reversed had a consistent theory.  The theory was very clear.  It was a competitive theory, and it was MFO only.  So everyone is making that it -- Neiman Marcus

had a -- it was a "compare at" case, and what the plaintiff alleged, unlike here, the plaintiff alleged exactly what she thought that meant. She believed that that meant that Neiman Marcus was selling that product or other retailers were selling that product, it was a manufacturer's only product. That was the theory. That was the inference, and the Court -- and the Court allowed that to go forward.

We are not even at that stage yet.

THE COURT: That plaintiff in that case had no actual factual knowledge about her -- about those products. It was a theory grounded in an understanding of business practices and not more than that, right?

MS. DOOLIN: No. She alleges that she had a basis for that because she alleges that the products that she bought were of inferior quality. She had the products herself. She was alleging, "I'm saying that these were designed and manufactured for an outlet store and they were in an inferior product quality, and that is my basis to think that they were manufactured only for the outlet."

That is not in our complaint nor has the plaintiff ever made that contention.

Last time we were here, the plaintiff said, "Oh, no, you only sell everything at MFO. That's all you do." And that's how he got through the first round, which was saying, that's what they do, Your Honor, so it never sold anywhere

else.

But now not only has the plaintiff not fixed what the Court asked him to do specifically on the three issues -- I mean, the Court's order, as you've gone over it, was very clear:  former, original, and regular are inconsistent and can't mean the same thing.

When the plaintiff walked into the store --

THE COURT:  Let's pause for a moment and talk about inconsistency, and then we'll talk about the factual proof both in *Rubenstein* and here.

Resting on several assumptions, including that it happens in outlet stores and that it happened here, it would be possible, right, without being inconsistent, to say the fraud for T-shirts is a former price or a 90-day theory, and the fraud for shoes is an outlet exclusive false-price theory. Those wouldn't be sort of mutually inconsistent at the level of theory because they're about different products, true?

MS. DOOLIN:  I think it would be -- I think it's inconsistent because the plaintiff is alleging in the complaint a product that supposedly was only sold for manufactured for outlet, and I think that theory --

THE COURT:  That takes away half of my hypothetical. So let me try it again.  And don't worry, I understand hypotheticals, you know, so I know it's not your case.

Just to get around -- just to deal with the

inconsistency problem which has troubled me from the beginning of this complaint, if we imagine that at a Nike Outlet store there's a shoe there that was only made for the outlet store, sold at the outlet store, always for the outlet store price, with a double-price price tag on it, and sitting next to it is a T-shirt that used to be for sale at the Nike Store here in Portland and it didn't sell, and so, you know, it's now sent off to the outlet store and it's offered there at the outlet store again with two price tags, and the one is -- the higher price is its former retail store higher price, but more than 90 days ago.

Wouldn't you, in fact, in a complaint, if you knew enough, you could move the complaint forward at a factual level, wouldn't you be, in fact, required to allege two different theories for fraud for those two products?

MS. DOOLIN:  I mean, the issue that we -- I understand what the Court is saying is that --

THE COURT:  Well, before you give me your explanation, take a stab at yes or no.  Wouldn't you be required to allege two different theories or at least be allowed to allege two different fraud theories?

MS. DOOLIN:  If you could articulate what you had purchased and why you thought at the time you were being misled --

THE COURT:  Sure.  The plaintiff has to say, here's

why I think the shoe was fraud and here's why I think the T-shirt was fraud. If they could do all that, it's not inconsistent to have two fraud theories for two different products in a complaint, right? They could have come to the consumer down two different paths with two different ways of being fraudulent. It could have happened without being incoherent in the complaint, right? I don't think it's a hard question.

MS. DOOLIN: I agree with you except I just think that what we have here is from the plaintiff starting from a legal theory and then going backwards, and there is no facts to support it. That's really the problem.

THE COURT: I understand that's what you think, and we'll talk about the facts. So I just want to say at the outset then that I agree with both of you that it is possible not to be incoherent and allege Theory 1 as to one product and Theory 3 as to another.

So now we'll talk about factual support for Theory 3. And your problem -- well, you've had two big arguments about this complaint all along. One has been that it's been an absolute mishmash of theories and descriptors about what's going on with the pricing scheme. And I agree, and that's troubling.

And two is that there is -- particularly for the Theory 3, we'll call it, no real factual support.

So, once again, we're facing this argument, but now buttressed by *Rubenstein* that it's enough to get through the gate because Nike is the only place we can learn the facts about whether this fraud occurred.

So let's go back to *Rubenstein*. You said that one problem, one difference between this case and *Rubenstein* was that in *Rubenstein* they had a single coherent theory, and here you, as you put it, you have inconsistent theories.

So I think I just set that to one side for a moment because I think I have to treat this case as alleging, at the abstraction -- the level of abstraction only -- potentially consistent theories.

What else distinguishes this case from *Rubenstein*?

MS. DOOLIN: So *Rubenstein*, again, the factual analysis in *Rubenstein* was that the plaintiff was making the coherent theory the Court just went over and also alleging it was an inferior product.

THE COURT: So she had more than just hearsay knowledge, she had direct personal observation of what she says is a fact leading to a reasonable inference of why this product was made for an outlet store?

MS. DOOLIN: Right. I went into the store, I bought this product, I'm thinking it's a Neiman Marcus product. Lo and behold, it's not made with the same leather, it's not this, it's not that, it was only sold in this store. They weren't

suing for different products.  And it makes the analysis much easier because they were also suing under one guideline, right?  They're suing under the FTC guideline that deals with comparative pricing.

What the plaintiff is arguing, although the Court is trying to give them the two different products, that it's all the same, right, that we've got the former price, which is up here in the guidelines, then there's the compare at price, then we've got the MSRPs.

Our own statement is suggested retail price.  This is another very key important fact to distinguish us from *Rubenstein*.  Rubenstein's tag was "compare at."  The -- the facts alleged were that it was inferior.  In addition, it was a consistent theory because her inference or thought process, interpretation, reaction to that was that it was compared to things sold at Neiman Marcus.

What the plaintiff is doing here is looking at one price tag and saying it means something completely different, suggested retail price.  It doesn't -- if you're going to stay in Theory 1, which is MFO, which is made for factory, that's one thing, but when you're going to say that exact same ticket also means former price to the same purchaser, who can't identify which products, doesn't know what they're thinking, that's inconsistent.  It's directly inconsistent with what the price tag says.  That's why I think --

THE COURT: You think it's inconsistent because you think I ought to require the plaintiff only to give suggested retail price one meaning, not two?

MS. DOOLIN: Right. So -- or four or five. In the complaint there's five different interpretations of what she thought it meant. Was she defrauded five different ways? What did the plaintiff think the tag meant?

And that's why we raised the standing issue and all the other issues, because the plaintiff, depending on what -- she knows -- this isn't just what Nike knows. The plaintiff went in and made a purchase. When they went to talk about the retailers, if they're going to have two theories, is this a made for factory product or what product? It's just -- it's backwards. They're putting theories and they're saying, we can't know, we're looking on the Internet after the plaintiff purchased it and trying to slam it into what Nike does.

This is a fraud case. They come in here and said Nike is fraudulently tagging its products. We are entitled to know what exactly the plaintiff thought, why she thinks it was -- what was she deceived about.

THE COURT: What do you think the holding in *Rubenstein* is?

MS. DOOLIN: What I think the holding of the *Rubenstein* case is?

THE COURT: Yes.

MS. DOOLIN:  I think that -- I don't think it changes the law at all.  I think that, in fact, it even says --

THE COURT:  I didn't ask you about changing the law.

MS. DOOLIN:  The holding is it was an order reversing the motion to dismiss.

THE COURT:  That's not the holding.  Come on, you can do better than that.

MS. DOOLIN:  Well, I mean, it was -- the holding is that the plaintiff could proceed in that particular case based on the facts that she supported because she had given a factual basis.

THE COURT:  Well, let me try this one more time.  You're a smart lawyer.  You've given me two answers of what the holding is, neither of which would have gotten you passing civil procedures.

So the holding isn't that in this particular case this plaintiff wins, you know, on a motion.  That's not the holding.  The holding is that the Ninth Circuit, last I checked, it was the second highest court in the land.  It has to have some generalizable rule.  What's the generalizable rule of *Rubenstein*?

MS. DOOLIN:  That the plaintiff can get past a motion to dismiss when they have pled facts that -- which they have here, and that in line with other cases, when you have actual basis for it.  That is what the holding finds.

THE COURT:  Thank you.

MS. DOOLIN:  I mean, the plaintiff's argument means that once you have a reasonable consumer standard, that you get to go to the jury.  That's not what it says.  It even cites that when you can state cases or facts to support your argument, then you have to state them, which is exactly what this Court said.  The plaintiff should have some facts about her case, which makes her different from *Rubenstein*, because there she made allegations, and it can't just be you get to sue people for fraud and figure it out later.

I think another key fact that I just want to say is the issue of defense, those are two different theories, the former price, the -- the former price rule does not have a defense related to good faith that MSRP does.  They're completely separate.  They can't all be mishmashed together because we have different defenses, and part of having a complaint is so that I can marshal a defense if this ever gets past the pleading stage.

THE COURT:  Thank you.

I've made other rulings along the way.  What's left is really just to grant or deny the motion to dismiss the complaint as to the substantive fraud theories or claims.  And so we now agree -- or at least the plaintiff agrees that the complaint advances two fraud theories.  It does so, I must say, in a way that has to be discerned and not read, but here we are

at least with those two fraud theories.

I grant the motion to dismiss as to the former price theory for two main reasons.  One is that it lacks any -- even a shred of factual or inferences from factual support for its existence, which in a consumer protection case not sounding in fraud, I don't know what I'd do, but I have to think of Rule 9, even given the laws about consumer protection complaints.  It has to be something.

And so what it rests on are articles describing a general belief about retail practices that would be inadmissible in court and that really can't be said to provide any meaningful factual support for several of the points that a fraud complaint is supposed to disclose.  So that's one.  There's no factual support for it.

And two is that while I believe -- in fact, I have found already earlier just a few moments ago that it is possible to have a complaint with more than one fraud theory in it in this area of law if it rests on different products, and there's nothing wrong with that.

There is this other inconsistency that counsel has pointed out that I think is almost equally troubling, and that is that up to now, there's been a body of law developed about what different kinds of double price tags mean, and I think that has developed around kind of common sense lines about the possibility of what a consumer might think upon seeing

different sorts of higher priced descriptors.

And here to allow both theories to go forward means that I have to give two pretty different -- I won't say completely inconsistent, but two seriously different meanings to the same words on the price tag. A consumer would have to come in and think really two different things, and that's, in my view, irreconcilable. I think that a particular sort of double price tag has to have one meaning, or at least not two meanings that are so different. And so it's not possible, in my view, to advance multiple fraud theories like this based on the same phrase, "suggested retail price" in our case.

That leaves me with Theory 1, the outlet exclusive idea. And I said earlier that it seemed to be the main thrust of the complaint, and in my view, at least at the level that *Rubenstein* had it, it has factual support beyond trade articles. And so I deny the motion to dismiss the complaint on the outlet exclusive false-price theory.

We're at a point now where counsel candidly admits there's no more he can do to shore up Theory 3, and it has a sort of a fundamental inconsistency to it. And so I now grant the leave -- the motion to dismiss these with prejudice, but with this caveat: While the case will only go forward on the false-price theory, and while discovery will be limited to the false-price theory, it's certainly not only possible but I think plausible that exploring that theory will bring this

whole thing back around to me again.  We'll just have to see where that is.

So when I say "with prejudice" here, you'd have to seek extraordinary leave to say something had happened, but I'll see where that gets us.  I just don't want to go through another round of amendments and motions to dismiss, where as we sit here today, you have no avenue to find more facts and no avenue to avoid the inconsistency.  So I grant today the motion to dismiss with prejudice.

So where we are, then, is there is no injunctive relief.  There's no other theory.  There's the outlet exclusive theory.  It will move forward.  The others are dismissed with prejudice.  The class claims are not dismissed, and those will have to be litigated later in terms of questions of commonality and all that, if it even gets that far, and, for that matter, adequacy.

Having said that, I in theory believe that a named representative can represent class members who bought a different product.  That's just for today's purposes.  That doesn't mean that I'm making a decision about adequacy of representation or commonality or any of them.

So I think that resolves all the motions in front of me.  Any questions from plaintiff?

MR. KALIEL:  Your Honor, I'd ask one question about your ruling on discovery.

THE COURT:  I haven't made one yet.

MR. KALIEL:  You indicated that discovery would be limited in certain ways, and --

THE COURT:  Limited to the claim that's going forward.

MR. KALIEL:  And my only question was whether or not that would preclude us from asking general questions about Nike's practices.  Certainly we have to know what's going on as a whole as we attempt to prove our remaining claims.

THE COURT:  It's a fair question.  You know, one of the wisest phrases in the Bible is, "Sufficient unto the day is the evil thereof."  So today's evil has been resolved by my rulings, and I don't know how I'll rule on those.

MR. KALIEL:  Understood, Your Honor.

THE COURT:  I'll rule on them if and when they come up, with the idea that you only have one legitimate theory and that the standard rules will apply.  So I'm not creating a special new category of discovery.  I'll look at whether the questions you ask reasonably could lead to admissible evidence.

MR. KALIEL:  Thank you, Your Honor.

THE COURT:  And we'll resolve it that way and try to keep it moving along.

Thank you.

Any questions from defendant?

MS. DOOLIN:  Just one, Your Honor.  So the CLRA claim

is only brought as an injunctive matter.  There is no damage claim there.  Since the Court has stricken injunctive relief, is the Court also striking the CLRA claim?

THE COURT:  I'm not sure I understand the question.

MS. DOOLIN:  So the CLRA claim, the California Legal Remedies Act, the plaintiff has only brought it in injunctive fashion, so right now there is nothing left of that claim.  Since the Court has struck injunctive relief, I would ask that the Court also strike the CLRA claim.

THE COURT:  That seems right.  Any comments?

MR. KALIEL:  Except, Your Honor, that we retain the ability to add a damages claim under the CLRA after a certain period has commenced.  We still have that ability and would like to preserve the right, whether now or later in the litigation, to assert a damages claim for the CLRA even if injunctive relief doesn't move forward.

THE COURT:  You want to add a brand-new claim for damages?

MR. KALIEL:  I'm not sure it's a new claim, Your Honor, so much as another avenue of relief.

THE COURT:  You sought injunctive relief, which is gone.  So what would -- what sort of theory for CLRA violations would you be alleging -- CLRA damages?

MR. KALIEL:  For example, Your Honor, 1770(a)(13), which is misrepresenting the reason for price discounts, that

would entitle us to either injunctive or damages relief under the CLRA.  You've stricken the injunctive portion, but having stricken that doesn't necessarily preclude us from having damages under that same provision is the only point I'm trying to make.

THE COURT:  You just got me back to zero.  You have a complaint that sought injunctive relief.  That relief has been stricken.  So really what you're saying is you now want to amend your complaint to add a new theory for damages that you haven't yet alleged?

MR. KALIEL:  All I'm saying, Your Honor, if the CLRA, the current CLRA claim is going to be dismissed, it should not be with prejudice with respect to a potential damages claim because that is not currently before the Court, and it would exist independent of injunctive relief.

THE COURT:  All right.  Well, that's fair enough.  I do dismiss the claim, since we've never talked about it and it's never been the subject, as the other claims have, of attempts to amend appropriately and failing to do so, which is why I dismissed that with prejudice.  I dismiss it but without prejudice.

MR. KALIEL:  Thank you, Your Honor.

THE COURT:  Thank you.

Anything further from defendant?

MS. DOOLIN:  No.

THE COURT:  All right.  We'll be in recess.

THE CLERK:  All rise.  This court is in recess.

(Proceedings concluded.)

--oOo--


        I certify, by signing below, that the foregoing is a

correct transcript of the record of proceedings in the

above-entitled cause.  A transcript without an original

signature or conformed signature is not certified.



/s/Bonita J. Shumway                    August 29, 2017
_____         _____
BONITA J. SHUMWAY, CSR, RMR, CRR        DATE
Official Court Reporter